IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,     3:18-cr-00274-BR

    Plaintiff,               OPINION AND ORDER

v.

JOSHUA STEVEN KRUMWIEDE,

    Defendant.

**BILLY J. WILLIAMS**
United States Attorney
**KEMP L. STRICKLAND**
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204
(503) 727-1000

    Attorneys for Plaintiff

**LISA HAY**
Federal Public Defender
**ROBERT B. HAMILTON**
Assistant Federal Public Defender
101 S.W. Main St.
Ste. 1700
Portland, OR 97204
(503) 326-2123

    Attorneys for Defendant

1 - OPINION AND ORDER

**BROWN, Senior Judge.**

This matter comes before the Court on Defendant's Motion (#24) to Suppress and for a Franks Hearing. For the reasons that follow, the Court **DENIES** Defendant's Motions.

## BACKGROUND AND FACTS

The Court finds the following facts by a preponderance of the evidence based on the record as a whole, including the evidence presented at the hearing on October 10, 2018.

On February 4, 2018, Salem Police Officer Jon Michael Garland "went out on a . . . field incident report" to find an individual who Officer Garland knew had an outstanding warrant for his arrest.[1] Officer Garland was wearing a patrol uniform and driving a marked patrol vehicle when he observed the individual driving a car into the parking lot of the Days Inn motel located at 1600 Motor Court N.E., Salem, Oregon. Officer Garland followed the individual and parked behind his car.

Officer Garland explained to the individual that there was a warrant outstanding for his arrest and that Officer Garland would have to take the individual into custody. Officer Garland arrested the individual at 10:01 a.m. and placed him in the police patrol car. Officer Garland then drove the individual to the Marion County

---

[1] The individual is unidentified in the record because he is concerned for his safety if Defendant discovers he provided information to the police.

2 - OPINION AND ORDER

Jail approximately ten minutes away. While en route to the jail the individual told Officer Garland that Defendant Joshua Steven Krumwiede was staying in Room 114 at the Days Inn with Jenny Marie Dolan. The individual told Officer Garland that he had been in Room 114 the previous night with Defendant and Dolan when there were drugs and at least one gun in the room, and that Defendant and Dolan were associated with a maroon vehicle that was parked near the room. Officer Garland had observed one maroon car in the Days Inn parking lot that was parked approximately 15-to-20 yards away from Room 114 when he was there earlier. Officer Garland ran the license plates on the maroon car and found it was registered to the name of Krai Suksai.[2]

Officer Garland was already familiar with Defendant before February 4, 2018. Specifically, Salem Police Department Detective Justin Carney, who is assigned to the drug task force, informed Officer Garland that he was investigating Defendant as a suspected methamphetamine dealer who deals in "larger quantities" in the Salem and Portland area and who is associated with firearms.

At 10:16 a.m. Officer Garland contacted his supervisor Sergeant Johnson and advised him about the above information that the individual provided en route to jail.

At 10:39 a.m. Officer Garland left the Marion County Jail and

---

[2] The record does not reflect Suksai has any relation to Defendant or to the events of this matter.

drove to the parking lot of a Denny's restaurant near the Days Inn. Sergeant Johnson, Officer Garland, and other Salem Police Officers met in the Denny's parking lot to discuss the situation, including the fact that there was an outstanding, unrelated warrant for Defendant's arrest. Sergeant Johnson and the officers believed it would be a high-risk encounter to arrest Defendant because the individual had informed Officer Garland that there had been drugs and guns in Room 114 the previous night and because Defendant had a reputation as a drug dealer associated with firearms. The officers decided to observe Room 114, to wait until Defendant and Dolan were in the maroon vehicle, to approach the vehicle, and to box it in with patrol vehicles.

Salem Police Officer Sean Bennett approached the back side of the front office of the Days Inn on foot and staff let him into the office. Officer Bennett had a direct line-of-sight view of Room 114 approximately 25-30 yards away, and Officer Bennett had a clear and unobstructed view of the maroon vehicle. Shortly after Officer Bennett was in position, Defendant and Dolan came out of Room 114 and moved toward the maroon vehicle. Dolan was carrying a small dog, and Defendant was carrying a bag and a "large colorful lanyard" that was holding a set of keys that Defendant used to open the maroon car. When Defendant and Dolan got into the maroon vehicle, Officer Bennett could see the head and shoulders of Defendant and Dolan, but not farther down because "there was a lot of stuff" in the car.

Officer Bennett saw Defendant lean towards the ignition area, which caused Officer Bennett to believe that Defendant was about to start the vehicle. At that point Officer Bennett radioed the other officers and advised them that Defendant and Dolan were leaving, and the tactical-arrest team moved in. A number of officers parked their cars behind the maroon vehicle and blocked it from backing out of the parking spot. At approximately 10:58 a.m. Defendant was removed from the car and "proned out onto the ground." Officer Garland handcuffed him.

Officer Garland read Defendant his *Miranda* rights and asked Defendant whether he had any property in the maroon vehicle. Defendant stated he did not have any property in the maroon car, that it was not his car and he did not know to whom the car belonged, that he had been helping a friend, and that he had placed bags behind the driver's seat.

The officers searched Defendant and found a wallet and cellular telephone. The wallet contained approximately $5,000 in cash; two W-2G forms from Spirit Mountain Casino; and Oregon certificates of title for three different vehicles, none of which was the maroon vehicle.

Around the time of Defendant's arrest, Officer Bennett and Salem Police Officer Evan Whitney searched Room 114, but they did not find any personal property in the room.

Dolan remained at the scene of Defendant's arrest for

approximately 10-15 minutes. While there, Dolan told Officer Bennett that her makeup bag was in the maroon vehicle, but she did not want it and did not want anyone to get it for her. Dolan then left the scene on foot.

After Dolan left, Salem Police Officer Zambrano advised Officer Garland that there was an outstanding warrant for Dolan's arrest on felony charges of unlawful possession of methamphetamine and unlawful delivery of methamphetamine unrelated to the day's events. Officer Zambrano informed Officer Garland that the charges were related to an incident in which Salem police officers found almost a pound of methamphetamine in a different hotel room in the Salem area.

At some point after Defendant was arrested, Officer Garland called for a K-9 unit to come to the scene to do a dog sniff around the maroon vehicle. Officer Garland first contacted an Oregon State Trooper with whom he had worked in the past, but it was Superbowl Sunday and the Trooper was busy. The Trooper provided Officer Garland with information about other K-9 handlers in the area. Officer Garland attempted to contact two or three other K-9 handlers, but they were all unavailable. Finally, at 11:20 a.m. Officer Garland reached Benton County Sheriff's Deputy Jesse Blaser, who agreed to come to the scene. Deputy Blaser, however, had to travel from Corvallis to Salem (a distance of about 36 miles) so he did not arrive until 12:23 p.m.

Before Deputy Blaser arrived in Salem, Dolan returned to the Days Inn parking lot at approximately 12:11 p.m. Officer Garland asked Dolan for consent to search the vehicle, but Dolan declined to consent. At that point Officer Garland advised Dolan that she was under arrest pursuant to the outstanding arrest warrant. Officer Garland read Dolan her *Miranda* rights and took Dolan into custody.

At approximately 12:15 or 12:20 p.m. Officer Whitney transported Defendant to Marion County Jail where they arrived at 12:30 p.m.

When Deputy Blaser arrived at 12:23 p.m., Officer Garland briefed him about the individual's statements about being in Room 114 with Defendant on the previous night where there were drugs and guns in the room, that Defendant was under investigation for being a methamphetamine dealer, that Dolan had an outstanding warrant related to an incident in which nearly a pound of methamphetamine had been found in another motel room in Salem, and that Defendant and Dolan had entered the maroon vehicle and prepared to drive away before they were stopped. Officer Garland asked Deputy Benton "to apply his dog" to the maroon vehicle to sniff for narcotics. Deputy Benton walked his dog (who is trained to sniff for methamphetamine, cocaine, and heroin) around the vehicle, which had the doors shut. On the dog's second pass around the vehicle he began to sniff intensely up the seam of the B pillar of the passenger side of the vehicle. On a third pass around the vehicle the dog locked up and stared at the bottom half of the vertical seam of the passenger

door. Deputy Blaser then took the dog away from the vehicle, played ball with the dog, and talked with Officer Garland about the dog's alert. When Deputy Blaser took the ball away from the dog, the dog ran back to the vehicle and alerted to the presence of narcotics in the maroon vehicle at the same seam. After the dog alerted the second time, Officer Garland asked a patrol officer to remain with the maroon vehicle while Officer Garland went back to the police department and applied for a warrant to search the car. Officer Garland began working on the search-warrant application around 1:00 p.m.

Officer Garland obtained a warrant to search the maroon vehicle from Marion County Circuit Court Judge Susan Tripp at 8:00 p.m. Officer Garland returned to the Days Inn at 8:23 p.m. to conduct the search with Officer Zambrano. The officers discovered six pounds of methamphetamine and two loaded firearms in the vehicle during the search.

On June 9, 2018, Defendant was charged in an Indictment in this Court with one count of Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); one count of Possession of a Firearm During and in Relation to a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A); and one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On September 14, 2018, Defendant filed a Motion to Suppress

and for a *Franks* hearing and a Motion to Dismiss Count One of the Indictment.

On October 10, 2018, the Court held an evidentiary hearing and heard oral argument on Defendant's Motions. The Court denied as moot Defendant's Motion to Dismiss Count One of the Indictment. The Court also directed the parties to file supplemental briefing on the issue of the seizure of the vehicle. The Court took Defendant's Motion to Suppress and for a *Franks* Hearing under advisement on October 31, 2018.

## **DEFENDANT'S MOTION TO SUPPRESS**

At oral argument Defendant advised the Court that the thrust of his Motion to Suppress is that the police lacked probable cause to detain the maroon vehicle from the time Defendant was arrested until the dog sniff and lacked reasonable suspicion to perform the dog sniff. The dog sniff, therefore, was impermissible and could not form a basis for probable cause to obtain a warrant to search the maroon vehicle.

For purposes of his Motion to Suppress Defendant acknowledged there was a valid outstanding warrant for Defendant's arrest. Defendant, therefore, does not assert the seizure of his person, the search of his person, or his arrest were in violation of the Fourth Amendment.

At oral argument the government represented that it was not

asserting there was any community caretaking or inventory justification for the search of the maroon vehicle nor was the government asserting it was a search incident to arrest.  Finally, for purposes of Defendant's Motion the government conceded Defendant had a protected interest in the maroon vehicle.

Although the bases for the government's concession as to Defendant's interest in the maroon vehicle are unclear, the Court's analysis of Defendant's Motion proceeds only within the parties' agreed parameters.

I.  **The Law**

The first clause of the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A search within the meaning of this clause "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  "A "seizure" of property occurs when there is "some meaningful interference with an individual's possessory interests in that property."  Id.

The Supreme Court has made clear that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment.'"  Illinois v. Caballes, 543 U.S. 405, 408 (2005)(quoting United States v. Jacobsen, 466 U.S. 109, 124 (1984)).  In Caballes the Supreme Court noted

> any interest in possessing contraband cannot be
> deemed "legitimate," and thus, governmental conduct
> that only reveals the possession of contraband
> "compromises no legitimate privacy interest" . . .
> because the expectation "that certain facts will not
> come to the attention of the authorities" is not the
> same as an interest in "privacy that society is
> prepared to consider reasonable." *Jacobsen*, 466 U.S.
> at 122.

*Id.* at 408-09. In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court "treated a canine sniff by a well-trained narcotics-detection dog as *sui generis* because it 'discloses only the presence or absence of narcotics, a contraband item.'" *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707). Accordingly, the Supreme Court concluded in *Caballes* that "the use of a well-trained narcotics-detection dog — one that does not expose noncontraband items that otherwise would remain hidden from public view — during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* at 409 (quotation omitted).[3] The Supreme Court, therefore, held the Fourth Amendment does not require "reasonable articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *Id.* at 407, 410.

Relying on *Place*, the Ninth Circuit concluded in *United States v. Beale*, 736 F.2d 1289, 1289 (9th Cir. 1984), that a sniff of luggage

---

[3] Although this matter is not technically a "traffic stop" because the dog-sniff occurred after Defendant's arrest, there are very few cases involving dog sniffs in the context of an arrest pursuant to an outstanding warrant. The Court, therefore, analogizes to dog sniffs during traffic stops.

11 - OPINION AND ORDER

in the checked-baggage area of an airport by a drug-detection dog also did not constitute a search within the meaning of the Fourth Amendment.

Later in *United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993), the Ninth Circuit, relying on *Place* and *Beale* concluded a dog sniff outside of a commercial warehouse was not a "search" within the meaning of the Fourth Amendment. The Ninth Circuit noted the defendant could not have any "*legitimate* expectation that a narcotics canine would not detect the odor of the marijuana stored in the warehouse." 997 F.2d at 638 (emphasis in original).

## II. Analysis

Here the maroon vehicle was parked in a parking lot open to the public when Deputy Blaser applied his dog. As the Supreme Court noted in *Place,* "exposure of [the defendant's] luggage, which was located in a *public* place, to a trained canine – did not constitute a search within the meaning of the Fourth Amendment." 462 U.S. at 7070 (emphasis added). Defendant, like the defendant in *Lingenfelter,* could not have any legitimate expectation that a drug-sniffing dog would not detect the odor of the methamphetamine stored in the vehicle. In her dissent in *Caballes,* Justice Ginsberg commented that the majority's decision "clears the way for suspicionless dog-accompanied drug sweeps of parked cars along sidewalks and in parking lots." 543 U.S. at 845-46. Although this Court finds the dog sniff here was not "suspicionless," the Court

concludes neither reasonable suspicion nor probable cause was required in order for law-enforcement officials to conduct a dog sniff of the maroon vehicle because it was located in a public place and under *Place, Beale,* and *Lingenfelter* dog sniffs are not searches within the meaning of the Fourth Amendment.

To the extent that Defendant asserts the dog sniff was unreasonable because it was conducted more than an hour after Defendant was arrested; *i.e.*, law enforcement officers unreasonably seized and kept the vehicle between the time Defendant was arrested and the dog sniff occurred, the Court is unpersuaded. As noted, in *Caballes* the Supreme Court held a dog sniff conducted during a lawful traffic stop is not a search within the meaning of the Fourth Amendment.

The Court notes, however, that the Supreme Court has also concluded a "seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). With respect to a traffic stop, the Supreme Court noted "the officer's mission includes ordinary inquiries incident to the stop." *Id.* at 1615 (quotation omitted). "A dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing" rather than a routine measure connected to roadway safety. *Id.* Thus, an officer may extend a seizure beyond the time reasonably required

to complete the mission of the stop in order to conduct a dog sniff without offending the Fourth Amendment only when the officer has a "reasonable suspicion of criminal activity" that justifies the sniff. *Id.* at 1616. *See also United States v. Solorio-Mendoza*, 731 F. App'x 583, 586 (9th Cir. 2018) ("An officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion.").

Here between the time of Defendant's arrest and the dog sniff the officers already knew Defendant and Dolan had been in Room 114 and that the evening before Defendant's arrest there were drugs and guns in that room. The officers saw Defendant exit the hotel room with a bag that he put into the maroon vehicle, noted the vehicle was full of bags, and found Room 114 empty of any personal possessions. The officers knew the maroon vehicle was not registered to Defendant and that Defendant did not know who owned the maroon vehicle, but Defendant possessed keys to the vehicle and appeared to be prepared to drive it away from the Days Inn. In addition, officers were conducting an ongoing, separate investigation into Defendant's possible status as a drug dealer associated with firearms. The officers were also aware that Dolan had an outstanding arrest warrant on felony charges of unlawful possession of methamphetamine and unlawful delivery of methamphetamine related to an incident in which Salem police officers found almost a pound of methamphetamine in a different hotel room in the Salem area. The Court finds on this

record that officers had an independent, reasonable suspicion to request a dog sniff of the maroon vehicle.

In addition, although the dog sniff was conducted more than an hour after Defendant's arrest, the record reflects the delay was not due to any lack of diligence or effort to obtain a dog sniff sooner. A number of K-9 officers were off duty on February 4, 2018, because it was Superbowl Sunday, and Officer Garland had to call at least three officers before Deputy Blaser indicated he would be able to bring his dog for a dog sniff. Deputy Blaser, however, was in Corvallis approximately 35 miles away from the Days Inn in Salem. Courts have held in similar circumstances that delays of similar length are reasonable. *See, e.g., United States v. Brown*, 219 F. Supp. 3d 1030, 1038 (D. Mont. 2016)("The stop occurred in a rural area of Montana by a town that did not have a resident canine unit. In addition, Agent Grainger testified he was the nearest canine unit, and he arrived as quickly as he could. Thus, under these facts it was reasonable to prolong the stop for an additional 45 to 60 minutes to allow for the sniff search."); *United States v. $102,836.00 in U.S. Currency*, 9 F. Supp. 3d 1152, 1161 (D. Nev. 2014)(detention of the defendant 20-30 minutes after the initial traffic stop to wait for nearest canine unit was reasonable). Moreover, Defendant was in custody at the jail and was in no way free to return to the vehicle to drive it away during that time. Thus, Defendant's liberty was not restrained unreasonably for the purpose of conducting the

dog sniff.

On this record, therefore, the Court concludes neither the dog sniff nor the seizure of the maroon vehicle between the time Defendant was arrested until the dog sniff took place violated Defendant's Fourth Amendment rights. Accordingly, the Court denies Defendant's Motion to Suppress.

## DEFENDANT'S MOTION FOR A *FRANKS* HEARING

Defendant also moves for a *Franks* hearing on the grounds that the warrant that Officer Garland obtained from Judge Tripp resulted from material omissions and/or contained recklessly false information and the warrant did not establish probable cause to search the maroon vehicle if "cleansed" of these omissions or false information. According to Defendant, therefore, the Court should suppress the results of the search of the maroon vehicle. The government, in turn, asserts Defendant has not established that Officer Garland intentionally or recklessly omitted from his search-warrant application material facts that were needed to form the basis for Judge Tripp's finding of probable cause.

At oral argument Defendant conceded that the *Franks* portion of his Motion becomes irrelevant if the Court concludes the dog sniff was legally justified. As the Ninth Circuit noted in *Grant v. City of Long Beach*:

> [W]e have routinely held that a canine identification or 'alert' of illegal narcotics provides probable
16 - OPINION AND ORDER

> cause for the issuance of a search warrant, so long as the dog's reliability is established. *See United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993); *see also United States v. Spetz*, 721 F.2d 1457, 1464 (9th Cir. 1983)(*overruled on other grounds*)("A validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant only if sufficient reliability is established by the application for the warrant."); *United States v. $22,474*, 246 F.3d 1212, 1216-17 (9th Cir. 2001) (positive alert by police dog with "sophisticated" training constituted probable cause for a search when combined with other corroborating evidence).

315 F.3d 1081, 1085-86 (9th Cir. 2002), opinion amended on denial of reh'g, 334 F.3d 795 (9th Cir. 2003)

At the evidentiary hearing Deputy Blaser testified his dog had completed a preliminary 3-4 week course to imprint him with certain drug odors; a California 80-hour canine drug-detection course, which he passed with a score of 100% (meaning he did not provide any false-positives); and an Oregon certification test. Deputy Blaser also testified his dog had been applied 23 times in the field at the time of the search of the maroon vehicle. The dog alerted to drugs 12 out of the 23 applications, and eight of the alerts were followed by finds of narcotics.

The Court finds on this record that the government has established Deputy Blaser's dog is sufficiently reliable to support a finding of probable cause to search the vehicle and to issue the warrant to search the maroon vehicle.

Accordingly, the Court denies Defendant's Motion for a *Franks* Hearing.

17 - OPINION AND ORDER

## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion (#24) to Suppress and for a Franks Hearing.

IT IS SO ORDERED.

DATED this 6th day of December, 2018.

_____
ANNA J. BROWN
United States Senior District Judge